**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 20-CR-291 (JEB)** |
| | : | |
| **v.** | : | **Sentencing Date: July 23, 2021** |
| | : | |
| | : | **18 U.S.C. § 1001(a)(2)** |
| **VICTOR RAMOS SANCHEZ** | : | **(False Statements)** |
| **Defendant.** | : | |
| | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On January 25, 2021, Victor Ramos Sanchez, ("SANCEHZ" or "the defendant") pled guilty to one count of Making a False Statement in a Federal Bureau of Investigation ("FBI") investigation.  As delineated in the Statement of Offense, since 2004, the Islamic State in Iraq and al-Sham ("ISIS") and its predecessors have been designated by the U.S. Secretary of State as a Foreign Terrorist Organization ("FTO") and as a Specially Designated Global Terrorist ("SDGT").  Since September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and ISIS's leadership gave blanket approval for indiscriminate killing by people residing in these countries. During this period, SANCHEZ and several of these persons, including Hannibal Kokayi (KOKAYI) (collectively known as the "Hijrah Group"),[1] became convinced that ISIS was the true Caliphate, and the Hijrah Group agreed to travel to ISIS territory to support ISIS by committing violent jihad against ISIS's enemies.  SANCHEZ was an ISIS supporter who was

---

[1]      Kokayi pled guilty to making false statements to the Federal Bureau of Investigation ("FBI") in this same investigation 21-CR-308 (JEB), and was sentenced, on July 16, 2021, to 24 months' probation with 6 months of home confinement.

radicalized in part by P-1, a radical Jamaican cleric, who has regularly espoused support for ISIS. After SANCHEZ left the Hijrah Group, United States Office of Foreign Asset Controls ("OFAC") designated P-1 in December 2017 as a Specially Designated Global Terrorist ("SDGT").

On August 8, 2019, SANCHEZ was subpoenaed to testify before the grand jury in connection with this investigation.   After appearing with counsel, he made numerous material false statements about his desire to travel to ISIS territory, his knowledge of others who supported ISIS and wanted to perform jihad on behalf of ISIS, his preparations to be able to fight jihad, and his efforts to recruit and radicalize others in the United States to support ISIS and to perform hijrah[2] to ISIS territory.

As discussed herein, although SANCHEZ's offense is a serious one, a number of factors favor a probationary sentence for the defendant.   When SANCHEZ was 23 years old, he became the first member of the Hijrah Group to leave, and he did so prior to law enforcement action.   The defendant pled guilty early in this matter and agreed to cooperate in the government's counter-terrorism investigation into activities of ISIS and its supporters in the United States.   In part as a result of the defendant's cooperation, Hannibal Kokayi pled guilty before this Court in May 2021 for related conduct.   As discussed further below, the government believes that SANCHEZ should be sentenced to a period of 24 months' probation with special conditions that reflect the seriousness of his conduct.

## Factual Summary

### A.  The Defendant Was an ISIS Sympathizer Who Wished to Travel Abroad to Fight Violent Jihad and Die a Shaheed (Martyr)

---

[2]      Hijrah is an Arabic term for migration usually to a Muslim land.   As used by SANCHEZ and others relevant to this case, hijrah meant travel to ISIS territory to commit jihad.

Starting in or about August 2014, SANCHEZ and a small group of his fellow Muslim friends and family members became enamored with ISIS and devoted significant time obtaining and distributing ISIS propaganda.   This activity commenced approximately the same time that P-1 married KOKAYI's mother, P-2.   KOKAYI, SANCHEZ, P-3, P-4 (KOKAYI's brother), P-6, and P-8 also regularly listened to P-1's speeches and lectures through the Internet at KOKAYI's home[3] in the District of Columbia, in which P-1 instructed Muslims that it was their religious obligation as Muslims to give their allegiance to ISIS's leader, Abu Bakr Al-Baghdadi (another SDGT), immigrate to ISIS territory ("hijrah"), and support ISIS's military struggle and jihad against any nonbelievers.   SANCHEZ, KOKAYI and members of the Hijrah Group agreed that ISIS was a legitimate Caliphate, and that they were religiously required to travel to Syria/Iraq to perform hijrah to fight jihad (actual war fighting) for ISIS.   The Hijrah Group consisted of SANCHEZ, KOKAYI, P-3, P-4, and P-8.   The members of the Hijrah Group believed that fighting jihad for ISIS was religiously required of them, and that if they died fighting for the Caliphate that they would die as shaheeds, or martyrs, who would go to Paradise and gain religious privileges and respect in the afterlife.   Between at least August 2014 and March 2017, SANCHEZ, KOKAYI and other members of the Hijrah Group regularly found, watched, and shared ISIS videos and propaganda (including on-line magazines and videos) that graphically showed violent attacks against civilians and the gruesome murder, immolation, and decapitation of ISIS captives.   For example, on October 25, 2014, P-4 accessed Twitter accounts of known ISIS supporters and took the following screenshot.

---

[3]   Between August 2014 and early 2017, SANCHEZ lived in KOKAYI's home.



Allah Yarhamak! I can't stop looking into his eyes. Never seen anything like this. Shaheed IA!! اللهم تقبله في فردوس pic.twitter.com/iM061K91td"



P4 then distributed the picture to SANCHEZ and others from the HIJRAH GROUP.   They had the following conversation:

| P-4 | I remember him from Twitter his name was familiar. Abu dujana. May Allah give him shahada Ameen! |
|-----|------------------------------------------------------------------------------------------------|

4

| KOKAYI | No way man I've been Lookin for him |
|--------|-------------------------------------|
| P-4 | Yea man subhanallah I was surprised too |
| KOKAYI | I used to follow his accounts everytime he'd make a new one then he just stopped Makin em. Ameen |
| KOKAYI | Why are his eyes blue that's so cool lol |
| SANCHEZ | Ameen SubhanAllah is there something where I can read about him, I've never heard of him |
| P-4 | Yea that's what a lot of people are talking about. Inshallah it is good news for him, cause no one had seen anything like it |
| P-4 | His last few post  |

| SANCHEZ | May Allah elevate his status,   forgive &erase his bad deeds and multiply his good deeds, that picture I wonder what caused it, btw was he light skinned or is it just the black and white pic that makes look that way |
|---|---|
| P-4 | Ameen! Honestly I'm not sure |

When watching ISIS propaganda that included gruesome execution scenes, SANCHEZ and others in the Hijrah Group would respond with happiness, support for ISIS, and cheers of "Allah Akbar!"  For example, on February 15, 2015, SANCHEZ distributed to the Hijrah Group an ISIS propaganda video showing a bloody, mass beheading execution video of 21 Coptic Christians prisoners by ISIS fighters in Libya, that included direct ISIS threats against the West. The Group had the following conversation:

| SANCHEZ | Get it while it's hot!! |
| | مركز الحياة للإعلام "رسالة موقعة بالدماء إلى أمة الصليب"" on YouTube |
| | Watch مركز الحياة للإعلام : رسالة موقعة بالدماء إلى أمة الصليب |
| | http://youtu.be/IlUYpZSvm5g |
|---|---|
| P-3 | Daaaaaaang lol so much blood |
| P-4 | ☺☺☺☺☺👀👦<br>👆👆⁴ Allahu Akbar |

SANCHEZ, KOKAYI and other members of the Hijrah Group also attempted to recruit others to support ISIS by selectively introducing Muslim friends to ISIS propaganda and ideology.

---

4   The single index finger pointing up emoji was regularly used by ISIS supporters in social media to refer to its belief that Allah is the only true God and that Muhammad is his prophet. It has been used in official ISIS social media postings and propaganda.

In a number of cases, members of the Hijrah Group would invite these persons to KOKAYI and SANCHEZ's home in the District of Columbia (which P-2 owns) to show them less violent ISIS propaganda videos or lectures by P-1 to ascertain their views about ISIS, and to debate them if their views differed from those of the Hijrah Group.

SANCHEZ, KOKAYI and members of the Hijrah Group also agreed that they needed to prepare for hijrah, take security precautions to avoid being caught by law enforcement, and save money in order to make the journey.   Factual Proffer at ¶ 6.   They also encouraged one another to perform hijrah as soon as they could.   Id.   SANCHEZ, KOKAYI and other members of the Hijrah Group took numerous steps to prepare themselves for hijrah and jihad.   KOKAYI, SANCHEZ and other members of the Hijrah Group regularly went to play paintball and visited gun ranges to learn to fire different firearms, in part, to prepare themselves for hijrah and jihad. Id.   The following is illustrative of a chat with the Hijrah Group in December 2014 that indicates the group's mindset (emphasis added):

| KOKAYI | Yu [P-4] remember [P-10] and [P-11]? |
|---|---|
| SANCHEZ | No |
| P-4 | From where? […] |
| KOKAYI | And [P10] was that UH syrian or somethin guy hung out with [W-1] and [W-2] and them. Had shoulder length hair and had a bro named [P11] whom he looked almost exactly alike ring a bell? |
| P-4 | Yea sounds familiar, what about him? […] |
| KOKAYI | Haven't you noticed he's been missin a year? |
| P-4 | Yea I haven't really seen him in a minute, have you heard something about him |

| KOKAYI | *Just found out today him and his bro went there to fight. And I think both were killed. Inna lillahi wa Inna ilayhi rajioon[5]. iA allah accepts them as shaheed.[6]* |
|---|---|
| P-4 | *Subhanallah, Ameen!!* |
| P-4 | *Allahu Akbar* ☝ |
| KOKAYI | [sends a group image with P-10 to Hijrah Group] |
| KOKAYI | Far left member? Shoot man |
| P-4 | How did you find out? And can you send me a pic. I can't remember their faces |
| SANCHEZ | Ameen[7] |
| P-4 | *Alhumdulillah[8] man, inshallah they are both shaheeds ☝. May Allah unite us with them inshallah in jannah[9] as green birds[10]* |
| KOKAYI | Went to Umd and got bubble tea with [W-3] and she was tellin me about it Cuz she just found out. They were close friends so she was blown that he just up and left without Sayin bye so I explained pretty much the stuff that was going on there |
| P-4 | Oh ok gotcha, what was his name on fb. Tryna look him up |

---

[5]   "Inna lillahi wa inna ilayhi raji'un" is a verse from the Qur'an that means "Verily we belong to Allah, and verily to Him do we return."

[6]   Shaheed means a Muslim who had sacrificed his life for his religion, and who will reap certain benefits after death in Paradise.

[7]   An Arabic phrase used after prayers, meaning "Amen."

[8]   An Arabic term meaning "praise be to God."

[9]   Jannah means Paradise in Arabic.

[10]   The image of a green bird is a reference to a passage from the hadith, which indicates the souls of martyrs (shaheeds) will reside in bodies of green birds next to the Prophet in paradise. The green bird is a common symbol of ISIS supporters.

8

| KOKAYI | *Yea man iA I was like Subhanallah. I just really hope they found the right group or had the right intention. But Ameen iA we join em* |
| --- | --- |
| P-4 | *Inshallah they did, I'm happy for them tho* 😏.[11] *If their intentions were pure n they were doing it for the right reason they have succeeded n beat us too it. May Allah shower us with patience we need to make it. Ameen!!* |
| KOKAYI | *Exactly man that's what I keep thinkin. Ameen.* And it's [P-10] don't just look at his page but post that were written about em cuz [W-4] wrote somethin sayin they passed […] |
| P-4 | I've seen it subhanallah, may Allah reward them with a great reward Ameen ! |

The Hijrah Group also obtained information from ISIS sources to educate themselves how to travel to ISIS border areas in Turkey and elsewhere, and how to hide their intent to perform hijrah and fight jihad from law enforcement and border officials.   For example, on February 6, 2015, SANCHEZ received an ISIS booklet on how to perform hijrah and shared it with KOKAYI and other members of the Hijrah Group:

| SANCHEZ | http://justpaste.it/hjra-book |
| --- | --- |
| P-4 | 🙀🙀🙀🙀👌👍😎 thanks for the share Nasr |
| P-8 | That's gonna help a lot |

The cover of the on-line book and two several screenshots of the contents follow:

---

[11]       Smirking face emoji.



# CONTENTS

How Islamic State members get into & out of Syria ................................................. P5

INDEPTH Hijrah Advice 1: SUGGESTED SETUP FOR PACKING ........................................ P7

Hijrah Advice 2: Know Your Strengths & Weaknesses ........................................... P14

Hijrah Advice 3: GETTING STOPPED IN TURKEY ................................................... P16


How Operatives Get Through Airport Security Without Blowing Their Cover ................. P23

Abu Rumaysah skips his bail conditions and escapes the UK by Bus ........................... P24


Stories of Arab Fighters Migration to Syria ....................................................... P25

- Muhammad al-`Ubaydi ........................................................................... P25

- Al-Muhajir al-Rimi .............................................................................. P26

- Abu Thar al-Bahraini ............................................................................ P27

- Abu Thabit al-Jazrawi ........................................................................... P28

- Two Stories of Anonymous European Foreign Fighters ....................................... P29


A brother from UK (England) tells his emigration story to al-Sham (2013) .................... P30

A sisters Hijrah Story to al-Sham (2014) .......................................................... P36

British jihadist stabs man who insulted Prophet, boasts of escape to Syria (2015) ............ P38


Interview with Abu Hurayra al-Ameriki – a miracle story ..................................... P41

Twitter Accounts: .................................................................................. P47

Ahadith on Hijrah ................................................................................... p48

Further Reading ..................................................................................... P50

## Hijrah Advice Part 3 - GETTING STOPPED IN TURKEY

In shā Allah , I will try to shed light on two issues concerning which I have been receiving some queries. Some of you have asked what the Turkish authorities will do to you if they stop you.

First of all, there are two instances where they can stop you:

At the immigration office in the Turkish airport, while verifying your passport and whatnot, and When you will be in Turkey, travelling down south to the border.

Bear in mind that if they stop you, it doesn't mean that they will automatically deport you or detain you or put you through an unwanted situation. It's a toss-up. Trust in Allah.

In the first instance above, depending on factors such as your appearance, your country of origin, your (international) criminal record, etc., the worst they can do to you is deport you and/or detain you. I need to state the risks as they are, but, subhān Allah don't get paranoid or discouraged by that. I know one brother from the US who was saying that the FBI was on his back almost daily. However, he made it here passing through all the trials that this hijra posed, Al-HamdulilLah. Place your trust in Allah.

In the second instance, after you get through airport security, you need to know that if (i) you have a valid tourist visa to be in Turkey, (ii) you don't have some kind of an international search warrant on your head, (iii) you're not on any terrorist list or out of favour with the intelligence services of your country, and (iv) you don't have any incriminating material on your person or in your luggage , then, the Turkish authorities cannot arrest and detain you. All they can do is stop you, request you to produce identification (your passport, most probably), ask you a few questions, probably take you to a police station and ask you some more questions. Beyond that, they cannot do much more, bi-idhnilLah. According to the Turkish brother, some of the questions they might ask you are:

• "What is your purpose in Turkey?" - Just reply, "Tourism." And it's better if you know beforehand some of the tourist attractions of the area you are in or which will be on your way to the border. E.g. the Blue Mosque in Istanbul, the Tomb of Ataturk (la'natulLah 'alayh) in Ankara, the birthplace of Ibrāhīm AS in Urfa. Learn as much as you can about the tourist attractions found in the places on your itinerary.

• "Are you going to Syria?" - You can either flat out lie and answer in the negative and talk some more about how you want to visit the grave of Abu Ayyūb al Ansāri RA... Or you can invent a story about how you viewed a YouTube video about Syria and that moved you so much that you absolutely wanted to help the people (and that's true, Al-HamdulilLah) and that's why you're in Turkey to see if you can do anything to alleviate their plight. But still, don't say that you want to cross the border and enter Syria.

• "Are you a terrorist? Are you (linked to) al-Qaeda? Do you want to go to Syria to join al-Qaeda?" - The Turkish authorities don't differentiate between al-Qaeda and ISIS. They still think that ISIS and al-Qaeda are the same thing. You should categorically deny any links and push forward the tourism agenda to the maximum. However, be sure NOT to have any "incriminating" materials with you which would negate your story. This includes knives & weapons, combat boots, camouflage clothing, etc.: basically anything which screams out that you want to get your feet dusty.
So, in shā Allah, take your precautions:
Make sure your plane ticket is a return (two-way) ticket.

16

**B. The Defendant Repeatedly Lied to the Grand Jury About His Own Desire to Perform Hijrah and Jihad, and That of Others**

As the Statement of Offense makes clear, SANCHEZ did not want to appear in front of the grand jury: he failed to appear; he told KOKAYI and others about the grand jury subpoena, and when he was finally arrested for failing to appear, and ordered to appear before the grand jury, SANCHEZ lied multiple times, despite being given multiple opportunities to tell the truth. SANCEHZ lied under oath about his support of ISIS, his knowledge of other people who supported ISIS, his knowledge of persons (including himself) who wanted to fight jihad for ISIS against the United States and its allies, and knowledge of persons (including himself) who he knew wanted to travel to support ISIS by performing hijrah to ISIS territory.   Each of these lies was material to the ongoing FBI and grand jury investigation into persons in the District of Columbia and elsewhere who may be providing material support to ISIS.

These statements were significant to two investigations which were concerned about the activities of the Hijrah Group, including P-4, and others[12]   Of particular importance, ISIS is a dual threat.   First, it was highly successful in recruiting foreign fighters from the U.S. and elsewhere to travel to ISIS territory and engage in fighting against U.S. and allied troops.   Second, and of greater concern, ISIS called upon its supporters in the West to commit spectacular terrorist attacks in the West, whether by knife, truck, or firearms.   While both concerns were present here, this second concern was even greater based on the groups' connection with P-1.   When OFAC designated P-1 a SDGT in December 2017, it recognized that P-1 was closely associated with

---

[12] In August 2018, P-4 was arrested in Virginia for sex crimes associated with a minor.   P-4's desire to travel to ISIS territory and perform jihad were material issues that were raised at P-4's sentencing hearing because P-4s conduct included radicalization of the minor victim.

several persons who committed terrorist acts in the United States and Europe. See "Treasury Sanctions Jamaica-Based ISIS Recruiter, located at https://www.treasury.gov/press-center/press-releases/Pages/sm0231.aspx (December 7, 2017).

While it is true that none of the members of the Hijrah Group have, to date, attempted to travel to ISIS territory, the government believes the reasons for this have more to do with happenstance and the intervention of law enforcement. The Hijrah Group was meeting regularly from August 2014 through early 2017 in KOKAYI's home (owned by P-2) in the District of Columbia, and members of the group were still preparing to travel and were saving money to travel to ISIS territory. In late 2016, however, ISIS began to suffer steep battlefield losses in Iraq and Syria, including its ties to the Turkish border where most foreign travelers crossed into ISIS territory. Law enforcement was also stepping up its efforts to try and interdict foreign fighters who wished to travel to fight for ISIS.

Around the same time in late 2016, ISIS publicly called upon foreign supporters to commit terrorist attacks against the West in case they could not come to ISIS territory. Thereafter, there were numerous terrorist attacks committed by ISIS-inspired terrorists in the United States and Europe in 2016 and 2017. In 2017, the ISIS reversals on the battlefield continued, and Mosul was liberated from ISIS control in July 2017. Meanwhile, in April 2017, SANCHEZ and P-3 had broken up because SANCHEZ was having an affair, and SANCHEZ was ostracized from the Hijrah Group, and he no longer associated with the group. Shortly thereafter, on or about August 25, 2017, P-1 was arrested and detained in Jamaica on New York State terrorism offenses. P-2 was also briefly detained and questioned by Jamaican authorities during that encounter. In January 2018, P-2 left P-1 and Jamaica to come back to the United States, and P-2 was questioned

by the FBI on her return.   P-2 indicated she was Islamicallly divorced from P-1 and was planning to stay back in the United States.   In July 2018, the FBI questioned KOKAYI at Dulles Airport on his way back from Egypt, where he had met with his future wife.   In August 2018, P-4 was arrested in Virginia for sex crimes associated with a minor, and KOKAYI was again questioned by the FBI (and lied).   In addition, starting in at least June 2019, the FBI and the U.S. Attorney's Office took overt investigative steps that were known to SANCHEZ, KOKAYI and other members of the Hijrah Group.

### C.  SANCHEZ Agreed to Cooperate Against Other Hijrah Group Members

After the government sent SANCHEZ a target letter in November 2020, he contacted his counsel and agreed to debrief and cooperate with the United States.   The government met with the defendant on several occasions, and he provided truthful answers to questions posed by the FBI and the U.S. Attorney's Office.   After debriefing, the defendant agreed to cooperate and promptly pled guilty to a preindictment plea.   This decision saved significant government and judicial resources, including voluminous discovery.

More importantly, SANCHEZ agreed to cooperate against KOKAYI, in the event that KOKAYI decided to go to trial.   Cooperation in counter-terrorism cases generally has greater value than cooperation in other cases: the number of persons with inside knowledge or trust who have such information tends to be very limited, and the consequences of violent conduct by such persons can be exceptionally grave.   As such, SANCHEZ's cooperation has been worthy of significant consideration.   The government believes SANCHEZ's cooperation is substantial but given that he is already in the lowest Guidelines category (0-6 months), such benefit should be provided within the existing Guidelines range.

### D.  The Government Does Not Believe that SANCHEZ Still Has Extremist Views

SANCHEZ was a convert to Islam in his early teens, and was guided by P-1, P-2, P-4 and KOKAYI about what a good Muslim was obligated to do.   Unlike other members of the Hijrah Group, however, SANCHEZ was the first to leave the group in 2017.   When he did so, SANCHEZ was 23 years old.   His early decision, prior to any interaction with law enforcement, along with his decision to no longer espouse extremist ideology confirms to the government that he no longer harbors a belief in dying a shaheed or supporting ISIS (or other foreign terrorist groups).   While SANCHEZ's decision to lie to the grand jury despite this change might seem puzzling, the government believes that SANCHEZ was primarily motivated to protect his former friends from possible prosecution, even though they had ostracized him.   While understandable, this decision has led to his first criminal conviction.

### Determining the Sentence

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range[,]" which is "the starting point and the initial benchmark" for the sentence to be imposed. Gall v. United States, 552 U.S. 38, 49 (2007).   "Then, 'after giving both parties an opportunity to argue for whatever sentence they deem appropriate,' the court considers all of the section 3553(a) sentencing factors and undertakes 'an individual assessment based on the facts presented.'"   United States v. Akhigbe, 642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting Gall, 552 U.S. at 49-50).

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   The purposes of

sentencing are as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).   The Section 3553(a) factors also include the following:   (1) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (2) "the history and characteristics of the defendant," *id.*; (3) the Guidelines and Guidelines range, § 3553(a)(4); (4) any pertinent policy statement issued by the Sentencing Commission, §3553(a)(5), and (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

Of course, a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," Rita v. United States, 551 U.S. 338, 351 (2007), and it "may not presume that the Guidelines range is reasonable," Gall, 552 U.S. at 50; Nelson v. United States, 555 U.S. 350, 350 (2009).   .

A.     **United States Sentencing Guidelines Calculation**

Under United States v. Booker, 543 U.S. 220 (2005) and its progeny, in fashioning the appropriate sentence the Court must undertake a multi-step process beginning with a correct calculation of the applicable Guidelines range, based on findings of fact.   However,

> In so doing, [the court] may not presume that the Guidelines range is reasonable . . . [but] must make an individualized assessment based on the facts presented. If [the court] decides that an outside-Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. . . . After settling on the appropriate sentence, [the court] must adequately explain the chosen sentence

to allow for meaningful appellate review [under an abuse-of-discretion standard] and to promote the perception of fair sentencing.

Gall v. United States, 552 U.S. at 49-50 (citations omitted).

The government agrees with the PSR's conclusion regarding the applicable Guidelines Range -- with a Category I Criminal History (with which the government also agrees), and a two point subtraction for acceptance of responsibility (level 6), the PSR calculates the Guidelines range as 0-6 months.   As the Court is aware, this calculation creates a significant anomaly,[13] but the government does not challenge the validity of the calculated Guidelines range.

## B.   Application of the Section 3553(a) Factors

### 1.   Nature and Circumstances of the Offense

As set forth above, SANCHEZ's actions were dangerous.   SANCHEZ was part of a group of similarly-minded individuals who wished to support ISIS and were also willing to die on its behalf.   To conceal those facts, he lied repeatedly to the grand jury and interfered with the FBI's ability to fully understand the group's intentions and motives to support ISIS.   It is also true that that lying to the grand jury and the FBI in a case involving international terrorism places the entire community at risk.

While serious, SANCHEZ's false statements in August 2019 were less problematic than

---

[13]     The defendant's statements here undeniably involve international terrorism.   If the defendant pled guilty to the 8-year offense under 18 U.S.C. §1001(a)(2), the Guidelines Statutory Index would direct the Court to U.S.S.G. § 2J1.2, with a resultant Guidelines calculation that starts at level 26, with an adjusted Guidelines range after 3 levels for acceptance of responsibility of 23, yielding a Guidelines range of 46-57 months.   In contrast, in this case, since the defendant pled guilty to the 5-year maximum offense under the same statute, the Statutory Index directs the Court to U.S.S.G. §2B1.1, and a resulting level 6 offense, with a Guidelines range of 0-6 months, with no other enhancements available.

those of KOKAYI in 2018.   When SANCHEZ lied to the grand jury, those lies were known to the government, and the FBI did not need to spend as much resources and time to further ascertain the truth.

### 2.        History and Characteristics of the Defendant

Next, section 3553(a)(1) requires the court, in determining the sentence to be imposed, to consider "the history and characteristics of the defendant."   The government recognizes that SANCHEZ has had some difficulties as a child, but that he obtained his GED and at least attempted to maintain regular employment for several years.   SANCHEZ has no prior arrests or convictions, and he has been in a stable relationship.   He also does not appear to have any drug or alcohol problems.   His decision to ultimately cooperate also is a significant positive indicator.

### 3.   Respect for the Law and Deterrence.

Section 3553(a)(2)(A) & (B) requires the Court, in determining the sentence to be imposed on the defendant, to consider the need for the sentence to promote "respect for the law" and to "afford adequate deterrence to criminal conduct."   There are two aspects of deterrence, specific and general.   The government believes that specific deterrence is not needed in this case, and that general deterrence is not served by sentencing a cooperator, where no person was injured or hurt, to a period of incarceration.

### 4.        Consideration of the Applicable the Guidelines Range

The government acknowledges that the advisory Guidelines range should be given due weight and that a sentence in the guideline range is appropriate in this case.

### 5.        Avoiding Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court, in determining the particular sentence to be imposed on the defendant, to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

KOKAYI was sentenced by this Court to 24 months' probation, with six months home confinement, for lying to the FBI in July and August 2018.   While the government is also aware of another case in this jurisdiction, which is similar,[14]  that case did not involve a prosecution with the likelihood of cooperation against a close friend as part of the agreement to plead guilty.

### Special Conditions of Supervised Release

While the government does not have significant concerns that SANCHEZ is presently radicalized or supportive of ISIS, we are concerned that is possible he could return to that path. Fundamentalists who are motivated by religion to commit violent crime tend not to exhibit the same flags or triggers to their criminality as other persons in the criminal justice system: unlike

---

[14]     In United States v. Masoud Khan, 19-CR-007 (KBJ), the defendant wanted to travel to ISIS territory and fight jihad to support ISIS.   Khan, like SANCHEZ, was a P-1 follower who supported ISIS and wanted to travel and die a shaheed for ISIS, but who did not ultimately attempt to travel.   Instead, Khan sought advice on hijrah and jihad from P-1, and he wired money to P-1 in Jamaica in the name of P-2.   Khan also donated to P-1 an automobile part that P-1 had requested, and Khan dropped off that part to P-2 who was then staying with KOKAYI while P-2 was visiting the United States.   Khan, like SANCHEZ, lied multiple times to the FBI and other federal law enforcement officers about his contacts with P-1 and his desire to commit hijrah and jihad for ISIS.   Khan, also at the behest of P-1, deleted his encrypted communications with P-1 to hide the extent of their relationship from the FBI.   Khan was arrested and detained and pled guilty to Obstruction of Justice.   Khan thereafter provided substantial assistance to the United States.   On August 13, 2019, the Court applied U.S.S.G. §2J1.2, departed downward under U.S.S.G. 5K1.1 to credit Khan's substantial assistance to the government, and sentenced Khan to 20 months of incarceration, followed by three years of supervised release with numerous special conditions that are consistent with the special conditions requested in this case.   Unlike Khan, however, SANCHEZ voluntarily left the Hijrah Group several years before any law enforcement interaction, he did not delete materials, and he did not provide funds to P-1.

traditional factors of recidivism, fundamentalists may regularly attend religious services, avoid re-arrest, maintain employment, have stable families, and avoid drugs and alcohol.   Instead, their radicalization risk factors tend to be more focused online and with close friends with whom they can share their ideology.   SANCHEZ was radicalized online with his friends and family, as he listened to P-1's lectures, and regularly obtained, consumed, and shared ISIS propaganda.   The government therefore recommends the following special conditions of supervised release that have been identified by Probation in the PSR at ¶ 88:

(1) He refrain from any contact, directly or indirectly, with P-1 or any person who has been designated, or is a member of a group so designated, by the United States as a SDGT, through any medium, including social media (this includes any ISIS members);

(2) He refrain from viewing, reading, or watching, or reviewing material, videos, lectures or books created, authored, or dictated by P-1 or any person designated by the United States as a SDGT, regardless of whether it is online, on television, or through social media;

(3) Probation be permitted to monitor and search his computer and electronic devices, including mobile phone, to monitor his access to restricted persons and restricted material;

(4) Probation be permitted to polygraph the defendant upon request to ensure his compliance with his conditions;

(5) Probation be permitted to search his residence as requested to ensure his compliance with his conditions;

(6) He complete any violent extremism treatment plan recommended by Probation, for a period of one year;

(7) He refrain from communicating online in a foreign language without prior approval from Probation;

(8) Probation be permitted to use location monitoring and for the defendant to refrain from travel outside the Washington, D.C, Maryland and Virginia area unless agreed to by Probation or the Court;

(9) He refrain from international travel without Court approval; and

(10)   He perform at least 200 hours of community service as directed by Probation.

## Conclusion

For the reasons stated above, the government requests that this Court give credit to SANCHEZ for his cooperation and sentence him to 24 months' probation, with the special conditions delineated above.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By:   _____/s/_____
Tejpal S. Chawla
Assistant United States Attorney
D.C. Bar. No. 464-012
555 4th Street, N.W.
Washington, D.C. 20530
202-252-7280 (Chawla)
Tejpal.Chawla@usdoj.gov